**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| JOHN JAMES FOX,<br>　　　　　　　　Petitioner,<br>　　vs.<br>MIKE KNOWLES, Warden,<br>　　　　　　　　Respondent. | Civil No.　　　1:08-00290 DMS (RBB)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I. INTRODUCTION

John James Fox ("Fox" or "Petitioner") a state prisoner proceeding pro se, has filed a Petition for a Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 challenging his June 8, 2005, Fresno Superior Court conviction in case number F03904325 for first degree murder (Cal. Penal Code § 187), and murder in the second degree (Cal. Penal Code § 187). (Lodgment No. 1 at 194, 197.) The jury found true the special circumstances allegation that Petitioner intentionally killed James Sevey, Jr. while lying in wait. (Cal. Penal Code § 190.2(a)(15)). (*Id*. at 195.)  The jury also found true the allegation that Petitioner had personally discharged a firearm causing severe bodily injury or death to another person during the commission of both murders. (Cal. Penal Code § 12022.53(d)). (*Id*. at 194, 198.) On May 25, 2005, prior to his convictions, Petitioner entered a plea of no contest to possession of a destructive device. (Cal. Penal Code § 12303.) (*Id*. at 177-79.)

//

//

Fox was sentenced to state prison for life without the possibility of parole, a consecutive term of fifteen years to life, plus two consecutive terms of twenty-five years to life, plus two years concurrent. (Lodgment No. 8, Clerk's Tr. vol. 2 at 381-82.)  Fox contends his federal constitutional rights were violated because the trial court failed to properly instruct the jury regarding involuntary manslaughter and voluntary intoxication, and that he was denied the effective assistance of counsel.  (*See* Pet. at 5.)

The Court has considered the Petition, Respondent's Answer and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court **DENIES** the Petition.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).  The facts as found by the state appellate court are as follows:

> After six years of marriage and two children, James and Saskia Osborn-Sevey (Saskia) separated in May of 2002.  Marital dissolution proceedings, at times amicable, at other times hostile, ensued.  Saskia and the children stayed in the marital home.  James left, lived for a time in a cabin and for a time in an apartment, and then moved in with his mother Tedi and her husband Anthony Petrelli.
>
> Saskia met appellant the same month she and James separated.  Four months later, he moved into the former marital home with her and the children.  A year after the separation, she pulled the children from a fire that destroyed that home and moved afterward with the children and appellant into a travel trailer on her father's property.
>
> Sometime between 9:00 and 10:00 o'clock on the night of June 29, 2003, appellant arrived at the apartment of his long-time friend Shane Gray (Shane) where he kept a room and stayed one or two nights a week.  Appellant "probably had beer before he came over."  He talked about an argument he had with Saskia earlier that day.  He and Shane talked and drank for hours, consuming around a 12-pack of 12-ounce cans of beer.  He was "probably drunk" when he drove off in his pickup at about 1:00 o'clock in the morning.
>
> At about 2:00 o'clock in the morning of June 30, 2003, Anthony awoke to loud pounding at the door of his home.  James went to the door, Anthony heard shots, and James screamed, "Oh, my God, I've been shot!"  Tedi went to the door, Anthony heard shots again, and Tedi said, "I've been shot. Call 911.  I'm going to die."  She did. So did James.
>
> An officer securing the crime scene learned from three teenagers in a pickup that a similar pickup had been parked nearby 20 or 30 minutes earlier.  Shotgun shell casings at the crime scene showed the perpetrator used a 12-gauge shotgun and .00 buckshot

shotgun shells. Executing a search warrant later that day, an officer found inside appellant's pickup, which was similar to the one the teenagers were driving, a 12-gauge shotgun registered in his name and .00 buckshot shotgun shells consistent with, respectively, the weapon and ammunition used at the crime scene. Also inside his pickup was an empty cardboard 12-pack box for 12-ounce cans of beer.

Questioned before and after execution of the search warrant, appellant told an officer that he had gone to Shane's house the night before, that he had returned home at 10 or 11 at night, that he had gone to bed at about 1 in the morning, and that he had found out about the shootings at about 9:30 in the morning. He never told the officer he could not remember anything. He admitted "he owned a .357 Magnum and a .40 caliber and a 7 Millimeter and .22 caliber weapon" and said he "was sure those were the only weapons he owned." After he was told that a shotgun was found in his pickup truck, he admitted he owned that weapon, too, and said he had just forgotten about that one.

Raymond Deutsch, M.D., a certified expert in addiction medicine and a board certified specialist in internal medicine, testified for the defense that he interviewed appellant after reviewing, inter alia, the complaint, police reports, witness statements, Shane's trial testimony, and the report of the psychologist whom the defense retained to examine appellant. On the basis of appellant's interview statements about his drinking history, prior amnesiac blackout, and purchase of a 12-pack of beer and a pint of bourbon before he went to Shane's house, Deutsch characterized him as a binge drinker with a drinking problem. A heavy drinker can perform acts while neurologically below the level of consciousness and never recall those events due to amnesiac blackout. Since alcohol impairs the forebrain (evolutionarily responsible for thinking and making good judgments) but not the primitive brain (evolutionarily responsible for fight-or-flight reactions), appellant could have been so low on the fight-or-flight threshold that the shootings were immediate and impulsive reactions to stimuli without planning.

Diego Allende, M. D., a specialist in occupational health, testified on rebuttal for the prosecution that he prescribed two medications for neck and shoulder injuries that appellant suffered at work. One was a muscle relaxant whose side effects include altered judgment, dizziness, drowsiness, and impairment of short term memory. The other was a combination analgesic and anti-inflammatory whose side effects include dizziness, impairment of short term memory, and suppression of the central nervous system. Side effects over and above those from either medication alone could ensue from a combination of those medications and alcohol. Appellant never complained to Allende about the side effects of either medication.

Richard Blak, Ph.D, a clinical and forensic psychologist whom the defense retained to examine appellant, testified only on rebuttal for the prosecution. He opined after interviewing appellant and administering both the Million Multiaction Sectional test and the Rorschach Projective Technique test that he had no neurological deficits but had a mild obsessive tendency and a long-standing depression and often retreated into fantasy to deal with the harshness of life. Appellant's use of fantasy as a defense involved denial ("pretending something doesn't happen") and repression ("Pushing away from consciousness and awareness"). He opined that despite appellant's belief to the contrary he had some recollection of the events in question and that his test results were consistent with his having an awareness that he refused to acknowledge.

//

//

//

> Appellant testified that he drank a shot or two of bourbon before arriving at Shane's house, that he and Shane drank somewhere between 12 and 18 beers together, that he did not remember leaving Shane's house, and that the next thing he remembered was waking up the next morning. He acknowledged that the defense double-checked the forensic evidence and that "all the evidence" pointed to him.

(Lodgment No. 5 at 2-5.)

### III.   PROCEDURAL BACKGROUND

On May 16, 2005, the Fresno County District Attorney's Office filed an amended information charging Fox with two counts of murder, (a violation of California Penal Code section 187). (*See* Lodgment No. 1 at 145.) The amended Information alleged that at least one of the murders was murder in the first degree. (*Id*. at 146.) It was further charged that during the commission of the crimes Petitioner personally discharged a firearm, and that he killed the victims while lying in wait (a violation of California Penal Code sections 12022.53 (d) and 190.2(a)(15)). (*Id*. at 146.) It also charged Petitioner with possession of a destructive or explosive device (a violation of California Penal Code section 12303). (*Id*.)

On May 25, 2005, Petitioner entered a plea of no contest to possession of a destructive device. (Lodgment No. 1 at 177-79.) On June 8, 2005, a jury found Fox guilty of murder in the first degree of Henry James Sevey, Jr. ("Sevey") and murder in the second degree of Tedi Petrelli. (*Id*. at 194-97.) The jury also found true the alleged special circumstance that Petitioner intentionally killed Sevey while lying in wait. (*Id*. at 195.) The jury further found true the allegation that Petitioner had personally discharged a firearm causing severe bodily injury or death to another person during the commission of both murders. (*Id*. at 194, 197-98.)

Petitioner was sentenced on August 17, 2005, to life without the possibility of parole for first degree murder, a consecutive term of fifteen years to life for second degree murder, plus two consecutive terms of twenty-five years to life for the lying in wait enhancements, and two years concurrent for possession of a destructive device. (*Id*. at 375, 381-82.)

On August 18, 2005, Fox appealed his conviction in the California Court of Appeal, Fifth Appellate District, case number F048701. (Lodgment No. 2.) The state appellate court affirmed the judgment on January 9, 2007. (Lodgment No. 5.) On February 13, 2007, Fox filed a petition for review in the California Supreme Court, case number S150157. (Lodgment No. 6.) The petition for review was

denied without citation of authority on March 21, 2007. (Lodgment No. 7.)

On February 28, 2008, Fox filed a habeas petition in the Eastern District of California. [Doc. No. 1.] On July 14, 2008, Respondent filed an Answer and lodged portions of the state court record. [Doc. No. 13.] The matter was assigned to Judge Dana M. Sabraw on November 25, 2008. [Doc. No. 15.]

**IV.    DISCUSSION**

**A.    Scope of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

Because the Petition was filed after AEDPA's effective date, and because the claims were adjudicated on their merits in the state courts, Fox must satisfy either § 2254(d)(1) or § 2254(d)(2) to obtain federal habeas relief. *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

//

//

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams*, 529 U.S. at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).

### B.  Analysis

Fox raises two issues: (1) the trial court violated his rights to due process and a fair trial because it failed to properly instruct the jury on the lesser included offense of involuntary manslaughter, and because the court failed to instruct the jury on the defense theory of the case that Fox's voluntary intoxication made him incapable of forming the requisite intent for first degree murder, and (2) he was denied the effective assistance of counsel because counsel failed to object to the prosecution's presentation of privileged information. (Pet. at 5.) Respondent argues that Petitioner's claim regarding the trial court's failure to instruct the jury fails to present a federal claim, and in the alternative, that the state courts' denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer at 11, 14.) Respondent further argues that Petitioner is not entitled to relief on his ineffective assistance of counsel claim because he has failed to demonstrate that he is entitled to relief under *Strickland v. Washington*, 466 U.S. 668 (1984), or that the state court's adjudication of this claim was objectively unreasonable. (*Id*. at 15-16.)

#### 1.  Jury Instruction Claim

Fox argues that his Sixth and Fourteenth Amendment rights were violated by the failure of the trial court to instruct the jury on the lesser included offense of involuntary manslaughter "based on voluntary intoxication short of unconsciousness." (Pet. at 5; Lodgment No. 6 at 7[1].) Fox further contends that the trial court violated his due process rights when it failed to instruct on involuntary

---

[1] Petitioner did not fully develop his claims in his habeas corpus petition. Instead he refers the Court to his Petition for Review, filed with this Court as Lodgment No. 6.

-6-                                                                                       08cv00290

manslaughter based on voluntary intoxication as a theory of defense. (Pet. at 9.) Petitioner claims that the evidence supported a finding that he was unable to act with malice or the intent to kill, as required under first degree murder, due to voluntary intoxication which rendered him impaired but not unconscious. According to Petitioner, the instructions given by the trial court did not permit the jury to make that finding. (Lodgment No. 6 at 7.) Respondent contends that Petitioner has "failed to state a cognizable claim based on the alleged failure of the trial court to instruct the jury with a lesser-included offense to murder, i.e, that he could be found guilty of involuntary manslaughter even if his level of intoxication did not render him unconscious." (Mem. P&A Supp. Answer at 10.) In the alternative, Respondent argues that the state court's rejection of this claim was not an unreasonable application of clearly established Supreme Court law. (*Id*. at 11.)

Fox presented this claim on direct appeal to the California Court of Appeal, which rejected the claim in a reasoned decision. (Lodgment Nos. 2,5.) Petitioner then raised the claim in a petition for review with the California Supreme Court, which was denied without citation of authority. (Lodgment Nos. 6, 7.) In evaluating the merits of the claim, this Court must look through to the last reasoned state court decision. *See Ylst*, 501 U.S. at 801-06. Here, because the California Supreme Court summarily denied Fox's petition (Lodgment No. 7), the last reasoned state court decision came from the California Court of Appeal. (Lodgment No. 5.) The appellate court summarized the facts as follows:

> Appellant argues that the court violated his due process and fair trial rights by not instructing the jury that, even if he did not lose consciousness, voluntary intoxication could lower his criminal liability to involuntary manslaughter if he had neither malice nor intent to kill. The Attorney General argues that there was no instructional error and, alternatively, that error, if any, was harmless.
>
> Appellant's argument emphasizes the portion of the charge to the jury authorizing a verdict of guilty of involuntary manslaughter if due to voluntary intoxication he was not conscious and had neither malice nor intent to kill:
>
> > "Every person who unlawfully kills another human being while unconscious as a result of voluntary intoxication, and does so without an intent to kill and without malice aforethought, is guilty of the crime of involuntary manslaughter in violation of Penal Code section 192, subdivision (b)." (CALJIC No. 8.45 (modified).)
> >
> > "This law applies to persons who are not conscious of acting but who perform acts or motions while in that mental state. The condition of being unconscious does not require an incapacity to move or to act. [¶] When a person voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts dangerous to human life or safety. Under those

> circumstances, the law implies criminal negligence." (CALJIC No. 8.47 (modified).)
>
> "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged crime the defendant acted as if he were conscious, you should find that he was conscious, unless from all the evidence you have a reasonable doubt that the defendant was in fact conscious at the time of the alleged crime. [¶] If the evidence raises a reasonable doubt that the defendant was in fact conscious, you must find that he was then unconscious." (CALJIC No. 4.31.)

(Lodgment No. 5 at 5-6.)

The Court analyzed and rejected Petitioner's claim for the following reasons:

> However, appellant's argument gives short shrift to another portion of the charge to the jury authorizing a guilty verdict of involuntary manslaughter if due to voluntary intoxication, without reference to whether he was conscious, he had neither malice nor intent to kill:
>
> "Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect. [¶] Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug or other substance." (CALJIC No. 4.22.)
>
> "Further, *if the evidence shows that the defendant was intoxicated at the time of the alleged crimes, you should consider that fact in deciding whether defendant had a required specific intent and/or mental state contained in any of the charged crimes or contained in the lesser crime, thereto, or as to any special allegations or enhancements*. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed that specific intent and/or mental state, you must find that he did not have such specific intent and/or mental state." (CALJIC No. 4.21 (modified).)
>
> In his opening argument to the jury, the prosecutor called unconsciousness "the first question you'll have to answer when considering manslaughter" and argued there was "no evidence" appellant was unconscious: "Not remembering what happened does not equal unconscious." He emphasized that Deutsch never described appellant as unconscious but instead "essentially talked about the drinking and the blackout." He characterized as a defense to involuntary manslaughter voluntary intoxication that causes unconsciousness but called blackout simply an "I don't remember what happened" claim. He argued that appellant's testimony that he "was never there" was "not the statement of somebody that does not remember what happened" but an adamant denial of his presence at the crime scene. Likewise, he called his pretrial statements an "absolute denial of what was going on" that showed "his willingness to lie and change his story and basically have convenient amnesia when it serves his purposes." He emphasized there was "absolutely no evidence whatsoever, no credible evidence that he had a blackout. There is no credible evidence that this is a manslaughter case. This is a murder case."
>
> In his argument to the jury, appellant's counsel emphasized Deutsch's testimony that binge drinking so lowered appellant's fight-or-flight threshold and so impaired his ability to plan that he "acted on impulse" when he committed the homicides. With reference to Deutsch's testimony that a heavy drinker could perform acts while neurologically below the level of consciousness and never recall those events due to amnesiac blackout, he characterized blackout and unconscious as synonymous and

argued that appellant was "blacked out, unconscious, impaired" at the time of the crimes. He argued that appellant "snapped" and that the jury should return involuntary manslaughter verdicts, not murder verdicts.

In his closing argument to the jury, the prosecutor characterized as reasonable the theory that appellant premeditated and deliberated and had the intent to kill and derided as unreasonable the notion "that he just simply had this blackout and he didn't remember what happened and that he should be only found guilty of . . . involuntary manslaughter." To argue against that notion, he adopted the defense matrix that blackout and unconscious are synonymous. On that premise, he argued that "common sense will tell you" someone who has a blackout wakes up at home, not quite sure how he got home, but does not drive someplace else and "draw a person out and shoot [him] three times, once in the back," and shoot "the mother of that person, shoot her in the stomach," after coming to his aid. He argued there was absolutely no evidence to corroborate the defense "blackout theory."

(Lodgment No. 5 at 6-8)  (emphasis added).

There is no clearly established Supreme Court law which requires a trial court to instruct on a lesser included offense in non-capital cases.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Turner v. Marshall*, 63 Fl.3d 807, 819 (9th Cir. 1995) (overruled on other grounds by *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en banc)).  To the extent Fox argues that the trial court violated his due process rights by failing to instruct on the lesser included offense of involuntary manslaughter, he cannot obtain federal habeas relief on this claim in the absence of clearly established Supreme Court law.  *See Carey v. Musladin*, 549 U.S. 70, 76-77  (2006).

In the context of a trial court's failure to give an instruction on a theory of the defense, however, the Ninth Circuit has noted that "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness . . . [which] require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002) (citing *Mathews v. United States*, 485 U.S. 58, 63 (1988) and *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Thus, a "'[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable.'" *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006) (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)); *Solis v. Garcia,* 219 F.3d 922, 929 (9th Cir. 2000); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (stating that "[a] criminal defendant is entitled to adequate instructions on his or her theory of defense") (quoting *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976).)

1  //

2

3        Fox contends that he was entitled to "proper and complete instructions" on involuntary
4  manslaughter based on voluntary intoxication because it was a defense theory of the case, but that the
5  court deprived him of this right when it combined the jury instructions for Involuntary Manslaughter
6  (CALJIC No. 8.45) and Involuntary Manslaughter- Killing While Unconscious Due to Involuntary
7  Intoxication (CALJIC No. 8.47). (Lodgment No. 6 at 9.) Petitioner vigorously argues that the evidence
8  supported a finding that he lacked malice or the intent to kill based on his voluntary intoxication, but
9  the instructions as given by the trial court did not allow the jury to make such a finding, instead
10 requiring that the jury find involuntary manslaughter only if they found he was unconscious as a result
11 of voluntary intoxication. (*Id*. at 7.) Fox claims that he requested CALJIC No. 8.45[2] which would have
12 "provided the missing elements regarding the effect of voluntary intoxication on the prosecution's
13 burden of proof as to murder and involuntary manslaughter."[3] (Lodgment No. 6 at 10.)

14       The trial court rejected CALJIC No. 8.45 as requested by Fox, and did not discuss the decision
15 on the record. (Lodgment No. 8, Clerk's Tr. vol. 2 at 315-18.) However, the court noted that "[w]ith
16 regard to involuntary manslaughter and its mental state, criminal negligence is required, so we are
17 placing in the instruction the definition of criminal negligence." (Lodgment No. 16, vol. 7 at 538.) The
18 trial court also cited *People v. Heard*, opining that "voluntary intoxication is not a complete defense"
19 and stating that the potential effect of voluntary intoxication on the required mental state for murder
20 would be "taken care of in our instructions." (*Id*. citing *Heard*, 31 Cal. 4th 946, 981 (2003) (voluntary
21 intoxication was not a complete defense where jury was instructed that it should consider the effect of

22

---

23     [2]CALJIC No. 8.45 as requested by Petitioner states: "Every person who unlawfully kills a human being
without an intent to kill, and without conscious disregard for human life, is guilty of the crime of involuntary
24 manslaughter in violation of Penal Code section 192, subdivision (b). [¶] A killing in conscious disregard for
human life occurs when a killing results from an intentional act, the natural consequences of which are dangerous
25 to life, which act was deliberately performed by a person who knows that his conduct endangers the life of
another and who acts with conscious disregard for human life." (Lodgment No. 8, Clerk's Tr. vol. 2 at 316.)
26

27     [3]In the version of CALJIC No. 8.45 that Petitioner requested, he omitted the portions of CALJIC No. 8.45
that state "Every person who unlawfully kills a human being, *without malice aforethought*" as well as the portion
28 that states, "[t]here is no malice aforethought if the killing occurred in the actual but unreasonable belief in the
necessity to defend [oneself] [or] [another person] against imminent peril to life or great bodily injury." *See*
CALJIC No. 8.45.

1  defendant's intoxication in determining whether defendant was capable of forming the requisite intent
2  for sexual offenses.)

4  Despite refusing to give the jury CALJIC No. 8.45 as requested by Petitioner, it is evident the
5  trial court combined CALJIC Nos. 8.45 (portions emphasized below) and 8.47[4] when it instructed the
6  jury regarding involuntary manslaughter and voluntary intoxication, stating:

> *Every person who unlawfully kills a human being* while unconscious as a result of voluntary intoxication, and does so without an intent to kill and without malice aforethought, *is guilty of the crime of involuntary manslaughter in violation of Penal Code section 192, subdivision (b).* [¶] This law applies to persons who are not conscious of acting but who perform acts or motions while in that mental state. This condition of being unconscious does not require an incapacity to move or act. [¶] When a person voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts dangerous to human life or safety. Under those circumstances, the law implies criminal negligence.

12 (Lodgment No. 16, vol. 7 at 559) (emphasis added).

13 By wording the instruction in this manner, it is arguable that the jury was confined to finding Fox
14 guilty of involuntary manslaughter only if they also found he was voluntarily intoxicated to the point
15 of unconsciousness. CALJIC No. 8.45 would have allowed the jury to find Petitioner guilty of
16 involuntary manslaughter even if they did not find he was unconscious as a result of voluntary
17 intoxication. However, a challenged instruction may not be judged in isolation; rather, it must be
18 considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72.
19 As the Court of Appeal correctly pointed out, the trial court also instructed the jury with CALJIC Nos.

---

[4]CALJIC No. 8.47 states: "If you find that a defendant, while unconscious as a result of voluntary intoxication, killed another human being without an intent to kill and without malice aforethought, the crime is involuntary manslaughter. [¶] This law applies to persons who are not conscious of acting but who perform act or motions while in that mental state. The condition of being unconscious does not require an incapacity to move or to act. [¶] When a person voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts dangerous to human life or safety. Under those circumstances, the law implies criminal negligence." CALJIC No. 8.47.

4.22[5] and 4.21[6], which define voluntary intoxication and instruct that if the evidence showed Fox was intoxicated at the time of the crimes, it could consider that fact when determining whether he had the specific intent and/or mental state required under the charged crime or in the lesser included offense. (Lodgment No. 5 at 6.) These instructions support Fox's defense theory that voluntary intoxication rendered him unable to form the required specific intent to commit murder, and would have allowed the jury to find him guilty of involuntary manslaughter if they found his level of intoxication made him incapable of acting with malice or the intent to kill, even if his intoxication did not rise to the level of unconsciousness.

In light of the above, Fox is incorrect in his assertion that the instructions given by the trial court limited the jury to finding involuntary manslaughter <u>only</u> if Fox was found to be unconscious due to voluntary intoxication. The trial court's instructions did not deprive Fox of his ability to present the defense theory that he could be found guilty of involuntary manslaughter based on voluntary intoxication, rather than murder. *Bradley*, 315 F.3d at 1098-99. Thus, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. *See Williams,* 529 U.S. at 412-13.

### 2. **Ineffective Assistance of Counsel Claim**

In claim two, Fox argues that his Sixth and Fourteenth Amendment rights to the effective assistance of counsel were violated by trial counsel's failure to object on the grounds of attorney-client privilege to the testimony of Dr. Blak, a psychologist and defense expert, who testified for the prosecution on rebuttal. (Lodgment No. 6 at 10.) Respondent counters that Petitioner has failed to demonstrate that he is entitled to relief under *Strickland v. Washington*, 466 U.S. 668, 700 (1984), and

---

[5]CALJIC No. 4.22 as read to the jury states: "Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug or other substance, knowing that it is capable of an intoxicating effect or when he willingly assumes the risk fo that effect." ¶ Voluntary intoxication includes voluntary ingestion, injecting or taking of any other means of intoxicating liquor, drug or other substance." (Lodgment No. 16 at 560.)

[6]CALJIC No. 4.21 as read to the jury states: "Further, if the evidence shows that the defendant was intoxicated at the time of the alleged crimes, you should consider that fact in deciding whether the defendant had the required specific intent and/or mental state contained in any of the charged crimes or contained in the lesser crime, thereto, or as to any special allegations or enhancements . . . ¶ If from all the evidence you have a reasonable doubt whether the defendant formed that specific intent and/or mental state, you must find that he did not have such specific intent and/or mental state." (Lodgment No. 16 at 560-61.)

1 therefore, the state court's rejection of this claim was not objectively unreasonable. (Answer at 14-16.)

2 Fox raised this claim on direct appeal. (Lodgment No. 4.) The California Court of Appeal rejected the claim in a reasoned opinion. (Lodgment No. 5.) Petitioner raised the claim in his petition for review filed in the California Supreme Court, which was denied without citation of authority. (Lodgment Nos. 6, 7.) As before, this Court must look through to the last reasoned state court decision in evaluating the merits of the claim. *See Ylst*, 501 U.S. at 801-06. The California Court of Appeal summarized the factual background as follows:

//

//

> Appellant argues that his attorney rendered ineffective assistance of counsel by not objecting to the defense psychologists's rebuttal testimony for the prosecution on the grounds of attorney-client privilege. The Attorney General argues that appellant's claim is meritless and, alternatively, that habeas corpus, not appeal, is the appropriate proceeding in which to raise the issue.

(Lodgment No. 5 at 8.)

The court opined:

> The record shows that although the defense retained Blak for a psychological evaluation of appellant he testified not for the defense but solely on rebuttal for the prosecution. The record shows no defense objection to his testimony. Since the burden of establishing ineffective assistance of counsel on appeal requires a defense showing that counsel's action or inaction was not a reasonable tactical choice, the issue is generally appropriate on habeas corpus but not on appeal since the record on appeal customarily sheds no light on why counsel acted or failed to act in the manner challenged. (*People v. Jones* (2003) 30 Cal.4th 1084, 1105.)
>
> Here, since the record shows that before interviewing appellant and forming his opinions Deutsch considered Blak's report, appellant waived the attorney-client privilege to that extent. (*See e.g. People v. Montiel* (1993) 5 Cal.4th 877, 923; *People v. Clark* (1993) 5 Cal. 4th 950, 1005-1008, limited on another ground by *People v. Moon* (2005) 37 Cal.4th 1, 17; *see also* Evid. Code, § 912, subd. (a).) Neither the extent nor the manner of that waiver is possible to discern on the record here, however.
>
> The court and counsel could have agreed off the record, at a bench conference or in chambers, that Deutsch's extensive reliance on Blak's report precluded the assertion of an objection on the ground of attorney-client privilege. Consistent with that hypothesis is the defense argument to the jury that after Blak opined, in light of the synergy of alcohol and medications, that appellant "believes he does not remember, but he remembers some" of the events in question he referred him to Deutsch, on whose evaluation the defense theory relied that his binge drinking lowered his "fight or flight" threshold and "impaired his ability to plan" so he "acted on impulse" when he committed the crimes. Likewise consistent with that hypothesis is the defense argument to the jury that a heavy drinker could perform acts both while in amnesiac blackout and while unconscious, that the case made no sense "other than the fact that the man snapped and he committed the crimes," and that appellant was guilty of involuntary manslaughter

1       because he was "blacked out, unconscious, impaired."

2       That we can hypothesize reasonable tactical bases for the absence of a defense objection on the ground of attorney-client privilege does not prove that there were any, of course. To prevail on appeal with an ineffective assistance argument, the defense must show a "demonstrable reality" that there were none. (*See People v. Lawley* (2002) 27 Cal.4th 102,136.) Since appellant fails to make that showing, our duty is to reject his argument.

6 (Lodgment No. 5 at 8-9.)

7 //

8 //

9 //

10       To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. He must also show he was prejudiced by counsel's errors. Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993). Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689. Morever, there is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

22       Petitioner argues that the communications between he and Dr. Blak were covered under the attorney-client privilege because his attorney consulted Dr. Blak in preparation for his defense. (Lodgment No. 6 at 11-12.) Petitioner contends that counsel provided ineffective assistance because a reasonably competent attorney would have asserted the privilege on his behalf when the prosecution called Dr. Blak to testify on rebuttal, particularly because Dr. Blak's testimony that Fox "believes he does not remember, but he remembers some" of what happened the night of the crimes was damaging to the defense theory of the case. (*Id*.) Respondent counters that Fox has not provided additional

information that demonstrates the appellate court erred when it held that Dr. Deutsch's reliance on Dr. Blak's report constituted at least a partial waiver of the privilege, and fails to demonstrate that counsel's representation was ineffective under *Strickland*. (Mem. P. & A. at 16.)

Because Petitioner has failed to show he was prejudiced by his counsel's alleged ineffectiveness, the Court declines to address whether counsel's representation fell below an objective standard of reasonableness. The evidence demonstrates that the jury could easily have reached the same conclusion Dr. Blak reached, that Fox believed he did not remember the events of that night, but that he actually did remember some of them. The day after the shootings, the police asked Petitioner what he had done the night before. (Lodgment No. 9 at 4.) Fox told the police that he had gone over to the burned out house and picked up the mail somewhere around 10pm, then went to Shane Gray's house and had "two beers," after which he said he was home around 11pm. (*Id*. at 3-8.) Petitioner stated that he had a hard time remembering exactly what time he did each of these things, but never stated that he had no recollection of what he did the previous evening. (*Id*.) The police then told Fox someone had identified his truck as being near the crime scene, and asked him whether he had been there, to which he responded "nobody saw my truck because my truck wasn't there." (*Id*. at 5.) As the prosecution argued in closing, that is "not the statement of somebody that does not remember what happened the day before, because he was very adamant, [he] was not there." (Lodgment No. 16 at 583-84.) During his testimony, Fox stated that he remembered packing for his trip to Hawaii, driving to the burned out house to get the mail, and drinking with Shane Gray, but could not remember leaving Gray's house, did not remember how his shotgun got on the floorboard of his truck, and did not remember killing the victims. (Lodgment No. 14 at 441, 445, 447.) Petitioner's repeated assertions to the police that he was not at the crime scene that night contradict his testimony that he could not remember leaving Gray's house the night of the crimes. Fox also testified he can normally drink a lot and "function(s) quite well. I was always the one that won the drinking games," which does not support his argument that he became so impaired that he could not remember killing two people. (Lodgment No. 14 at 453.) From the record it is clear that Dr. Blak's testimony was not the only piece of evidence that demonstrated Fox remembered some of what happened that night. Accordingly, the jury could have reached the same verdict even without Dr. Blak's testimony.

1    In addition, Fox admitted lying to the police about naming all of his guns except the shotgun, and where he found the shotgun the following morning. (Lodgment No. 9 at 11-12; Lodgment No. 14 at 451.) Fox also lied to the police about how much he had to drink that night, initially saying it was two beers, and then at trial testifying that it was the majority of a twelve or eighteen pack. (Lodgment No. 9 at 7; Lodgment No. 14 at 443-44, 452.) The jury was instructed with CALJIC No. 2.21.2 that "[a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point unless from all the evidence you believe the probability of truth favors his or her testimony in other particulars." (Lodgment No. 16 at 551.) In light of the inconsistencies between his police interview and trial testimony, the jury could have determined Fox actually did remember some of the events of that evening despite his insistence that he could not remember what happened.

Moreover, the evidence demonstrates the jury's determination that Fox was guilty of first degree murder rather than involuntary manslaughter is supported by the facts even without Dr. Blak's testimony. Despite his intoxication, Fox was capable of locating Sevey's house over a mile away from Shane Gray's house although he stated he had not been there for many months. (Lodgment No. 9 at 4.) Fox parked his truck on the street a short way from the home under a tree which is where the eyewitnesses saw the truck, rather than driving right up to the house and parking in front. (Lodgment No. 11 at 130; Lodgment No. 16 at 577.) Fox testified that he regularly locked his firearms in the gun locker in his truckbed, and the Mossberg shotgun used in the crimes was secured in the box earlier that night. (Lodgment No. 14 at 446.) Even though Fox was intoxicated, he was capable of unlocking the box and
removing the shotgun. (Lodgment No. 11 at 149; Lodgment No. 14 at 446-47, 470-71; Lodgment No. 16 at 576.) Further, despite his impairment, Fox approached the house silently, knocked on the door, and waited a few steps back and to the side, until his victim appeared. (Lodgment No. 11 at 67,154, 160; Lodgment No. 16 at 579.) From this location, Fox surprised his victim, shot him multiple times as he was turning to seek safety in his home, and then gunned down Sevey's mother as she attempted to protect her son. (Lodgment No. 11 at 569-70; Lodgment No. 16 at 384-400.) The jury could have concluded from the evidence that Fox was guilty of first degree murder even in the absence of Dr.

1  Blak's testimony.

2  Accordingly, there is not a reasonable probability that a more favorable outcome of the case
3  would have occurred had defense counsel objected to Dr. Blak's testimony.  Fox also suffered no
4  prejudice under *Strickland*.  In light of the above, the court of appeal's denial of this claim was not
5  contrary to, or an unreasonable application of, clearly established United States Supreme Court law.
6  *Williams*, 529 U.S. at 412-13.

7  //
8  //
9  //
10 //
11 //

### V.     CONCLUSION

Having carefully considered Fox's Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of the Answer, all the documents and legal authorities submitted by the parties, for all the foregoing reasons the Court **DENIES** the petition.  The Clerk of Court is directed to enter a judgment denying the petition with prejudice.

**IT IS SO ORDERED.**

DATED: August 20, 2009

HON. DANA M. SABRAW
United States District Judge